**GIBBONS P.C.**
Robert K. Malone
Kyle P. McEvilly
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
kmcevilly@gibbonslaw.com

-and-

**MCDERMOTT WILL & EMERY LLP**
Darren Azman (admitted *pro hac vice*)
Lisa A. Gerson (admitted *pro hac vice*)
Deanna D. Boll (NJ Bar No. 31861998)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mwe.com
dboll@mwe.com

*Co-Counsel to Natera Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>INVITAE CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11362 (MBK)<br><br>(Jointly Administered) |
| NATERA INC.,<br><br>Plaintiff,<br><br>v.<br><br>INVITAE CORPORATION, *et al.*,<br><br>Defendant. | Adv. Pro. No. 25-01015 (MBK) |

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

# Table of Contents

**Page**

I. The Complaint Provides More Than Sufficient Factual Allegations to Survive a Motion to Dismiss. ....7

II. Invitae's Arguments Do Not Support Dismissal of Natera's Complaint for Declaratory Judgment and Injunctive Relief ....9

A. Arguments Regarding Notice and Surprise Having Nothing to Do With Rejection of the APA ....9

B. Natera's Requested Relief is Not Inconsistent With the Plan and Plan Supplement. ....11

C. The Milestone Payment Did Not Become Due Prior to the Debtors' Breach, And Invitae's Legal Support for A Vested Rights to Payment Under the APA Does Not Apply ....13

D. Liquidating Debtors Assume & Assign Contracts Regularly ....15

III. The Plan Administrator, Acting for Invitae, Lacks Standing to Bring the Chancery Court Action ....17

CONCLUSION ....22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 400 Walnut Associates, L.P.*,
454 B.R. 60 (Bankr. E.D. Pa. 2011) ....9

*In re Access Beyond Technologies, Inc.*,
237 B.R. 32 (D. Del. 1999) ....19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....6, 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007) ....6, 7

*Biolife Solutions, Inc., v. Endocare, Inc.*,
838 A. 2d 268 (Del. Ch. 2003) ....12, 13

*Christopher v. Harbury*,
536 U.S. 403 (2002) ....6

*Cinicola v. Scharffenberger*,
248 F.3d 110 (3d Cir. 2001) ....17

*DeMarie v. Neff*,
2005 WL 89403 (Del. Ch. Jan. 12, 2005) ....13

*Erickson v. Pardus*,
551 U.S. 89 (2007) ....6

*In re Exide Technologies*,
607 F.3d 957 (3d Cir. 2010) ....13

*Field v. Mans*,
516 U.S. 59 (1995) ....12

*First Ave. W. Building, LLC v James (In re Onecast Media, Inc.)*,
439 F.3d 558 (9th Cir. 2006) ....15

*In re Fleming Cos.*,
499 F.3d 300 (3d Cir. 2007) ....17, 19

*Foglia v. Renal Ventures Mgmt., LLC*,
754 F.3d 153 (3d Cir. 2014) ....6

*In re Healfitz*,
85 B.R. 274 (Bankr. S.D.N.Y. 1988)....................11

*In re G-I Holdings, Inc.*,
580 B.R. 388 (Bankr. D.N.J. 2018)....................14

*G-I Holdings, Inc. v. Ashland, Inc. (In re G-I Holdings Inc.)*,
No. 17-0077, 2017 WL 1788656 (D.N.J. May 5, 2017)....................13

*In re Italian Cook Oil Corp.*,
190 F.2d 994 (3d Cir. 1951)....................11

*Karathansis v. THCR/LP Corp.*,
No. 06-1591 (RMB), 2007 WL 1234975 (D.N.J. Apr. 25, 2007)....................13

*Kavod Pharms. LLC v. Sigmapharm Labs, LLC (In re Tri Harbor Holdings Corp.)*,
No. 19-2053 (VFP), 2022 WL 17184547 (Bankr. D.N.J. Nov. 22, 2022)....................14, 15

*Lauter v. Citgo Petroleum Corp.*,
Case No. CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018)....................19, 20, 21

*Matter of M. Frenville Co., Inc.*,
744 F.2d 332 (3d Cir. 1984*), overruled in part by In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010)....................14

*Matter of Taylor*,
913 F.2d 102 (3d Cir. 1990)....................18

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
587 U.S. 370 (2019)....................11, 12

*National Organization for Women, Inc. v. Scheidler*,
510 U.S. 249 (1994)....................18

*In re Shar*,
253 B.R. 621 (Bankr. D.N.J. 1999)....................12

*Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*,
872 F.2d 36 (3d Cir. 1989)....................11

*United States v. Hays*,
515 U.S. 737 (1995)....................18

*In re Walnut Associates*,
145 B.R. 489 (Bankr. E.D. Pa. 1992)....................12

**Statutes**

11 U.S.C. § 101(5)(A) ....................15

11 U.S.C. § 105 ....................9

11 U.S.C. § 365(a) ....................3

11 U.S.C. § 365(f)(2)(A)....................19

11 U.S.C. § 365(g) .................... *passim*

28 U.S.C.§§ 2201-02 ....................9

**Other Authorities**

Fed. R. Civ. P. 8(a) ....................6

Fed. R. Civ. P. 12(b)(6)....................1, 6

Fed. R. Bankr. P. 7065....................9

Jesse M. Fried, Executory Contracts and Performance Decisions in Bankruptcy,
46 Duke L. Rev. 517 (1996) ....................19

Vern Countryman, Executory Contracts in Bankruptcy: Part 1,
57 Minn. L. Rev. 439 (1973) ....................13

**NATERA'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, Natera Inc. ("Natera" or "Plaintiff"), hereby submits this response in opposition to the *Debtors' Memorandum of Law in Support of Motion to Dismiss Natera Inc.'s Adversary Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* [Adv. Dkt. No. 8] (the "Motion to Dismiss") filed by Debtor Invitae Corporation ("Invitae" or "Defendant" and, together with the above-captioned debtors and debtors-in-possession, the "Debtors"), seeking to dismiss the *Verified Adversary Complaint* [Adv. Dkt. No. 1] (the "Complaint").[2]

**INTRODUCTION**

1. Invitae has not challenged the appropriateness of the declaratory or injunctive relief sought by Natera in its Complaint. Instead, Invitae's Motion to Dismiss purports to challenge the sufficiency of the factual allegations in the Complaint. In fact, Invitae's Motion is an attempt to re-write the Bankruptcy Code and a tacit challenge to this Court's jurisdiction. The reality is that Invitae wants its Chancery Court Action to proceed against Natera as if it never entered the Chapter 11 Cases, and as if it never rejected its contract with Natera. Yet, rejection has consequences, and only this Court can determine what they are.[3]

2. At its core, the issues raised in Natera's Complaint depend upon the answers to the following question: what are the practical and legal effects from Invitae's rejection of its APA with Natera? The answer to this question depends on 11 U.S.C. § 365(g) ("Section 365(g)") and principles of common law breach of contract, which, together, will ordinarily absolve a non-breaching party from performing obligations occurring after a debtor's breach from a rejected

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

[3] *See* Complaint at ¶¶ 12-17 (and the underlying documents referenced therein, which provide this Court with ***exclusive*** jurisdiction to resolve contract assumption and rejection issues). Invitae has not directly argued that this Court lacks jurisdiction to hear the Complaint, but it has commenced the Chancery Court Action against Natera as if the APA had not been rejected.

contract. Invitae's Motion to Dismiss entirely ignores Section 365(g) and asks this Court to accept that Section 365(g) and contract law principles have no legal effect. Seeking to dismiss a Complaint that asks the Court to declare the rights and responsibilities of a non-breaching party after the Debtors' rejection and resulting breach, while side-stepping Section 365(g) entirely, is an unusual strategy. But, for Invitae, it was necessary, because taking on Section 365(g) exposes what Invitae seeks to avoid – that its last-minute rejection of the APA is irreconcilable with Invitae's goal to reap the all of the benefits that may have been available to it had the contract been assumed. It was not.

3. The Debtors cannot avoid the fact that pursuant to Section 365(g), the Debtors breached the APA the day before the Petition Date, *i.e.*, February 12, 2024. If there were claims and causes of action against Natera for its conduct under the APA *prior to* February 12, 2024,[4] those claims and causes of action might remain, as it is undisputed that the contract was not rescinded by the Debtors' breach. However, the Debtors' Chancery Court Action depends upon an interpretation of contract provisions related solely to Natera's performance of obligations under the APA, arising *long after* February 12. The effect of the contract's rejection on Natera's obligations to continue to perform after the Debtors' breach must be determined before the Chancery Court Action can continue, and it may inform the Chancery Court what issues remain and whether that matter should move forward.

4. In an attempt to circumvent Section 365(g), Invitae misdirects this Court to arguments that have nothing to do with Section 365(g) or breach of contract generally, and which

[4] Invitae and Natera do not dispute the executory nature of the APA, nor do the parties dispute that Natera continued to perform under the APA during the Chapter 11 Cases, and there have been no allegations that Natera breached the APA pre-petition.

are not at issue in Natera's Complaint. Invitae makes four main arguments, three of which are false and one of which is based on facts not supported by the evidence.

5. ***First,*** Invitae argues that because Natera participated in the Chapter 11 Cases and received notice that Invitae wanted to pursue a cause of action on the APA, the Chancery Court Action "should be a surprise to no one." Motion to Dismiss, at 8. No doubt, prior to Invitae's rejection, Natera was aware that Invitae referenced the APA as a potential asset of the estates in the Debtors' Disclosure Statement and other public filings. Motion to Dismiss at 3, 9. But that notice became irrelevant following the Debtors' subsequent decision to reject the APA, resulting in a breach of the APA under Section 365(g). No one forced the Debtors to reject this contract on the Effective Date of the Debtors' Plan, which was long after they provided a discussion of the APA as a potential asset in the Disclosure Statement and other public filings. Indeed, the Effective Date of the Plan was the first time the Debtors included the APA on any rejection schedule or provided any notice that it intended to reject the APA, which it had been negotiating to preserve throughout its Chapter 11 Cases. While that surprise is interesting and likely strategic, it is not the focus of or basis for Natera's Complaint. Section 365(g) clearly provides that if a debtor rejects a contract, it has breached that contract as of the day before the Petition Date.[5] Nothing about notice and surprise (or the lack thereof) eradicates the Debtors' breach and the consequences of that breach under bankruptcy and state contract law.

6. ***Second***, Invitae argues that the Plan and Plan Supplement, "foreclose" Natera's requested relief as if to say that Natera's requested relief somehow runs afoul of the Plan and Plan Supplement. Motion to Dismiss, at 11-12. Invitae, however, misses the mark because Natera is

[5] Bankruptcy Code Section 365(a) provides that a debtor, subject to court approval, may assume or reject any executory contract. Section 365(g) provides that the rejection of an executory contract of the debtor constitutes a breach of such contract immediately before the date of the filing of the petition. 11 U.S.C. §§365(a) and (g)(1).

not seeking relief that would upset the apple cart. Indeed, Natera is not seeking to modify or overturn the Plan, the Plan Supplement, or the Confirmation Order. Rather, Natera's request for declaratory relief is compatible with Debtors' Plan and makes the Debtors' Plan Supplement Schedules harmonious. On the one hand, the Debtors listed on Schedule A(i) to the Plan Supplement "Claims and Causes of Action arising from or related to . . . Natera's obligation to perform under the Asset Purchase Agreement." *Id.* at 6-7 (Dkt. No. 857, filed on August 1, 2024). On the other hand, the Debtors rejected this APA on Schedule C to the Plan Supplement. (Dkt. No. 932, filed on August 7, 2024). *See* Complaint at ¶¶ 35-36. These schedules can be read together and not inconsistently with one another, but Section 365(g) and state contract law governing the APA must play a role. In other words, the Debtors can retain causes of action related to Natera and the APA (Schedule A), but by rejecting the APA (Schedule C), this Court must determine what remains of those obligations given the Debtors' breach. Finally, Invitae makes much ado about the Debtors' Plan language that reserves/retains causes of action "notwithstanding the rejection or repudiation of any Executory Contract" (Motion to Dismiss at 1), but the same rational applies to negate that argument – while Invitae might be able to retain causes of action on a rejected contract for actions leading up to the Debtors' breach, it cannot retain causes of action that would compel and relate specifically to performance by the non-breaching party after the date of the Debtors' breach.

7. ***Third,*** Invitae argues that the Milestone Payment referenced in the contract became vested before the Debtors breached the contract. Motion to Dismiss at 12-13. In support of its claim, Invitae relies on a footnote contained in its complaint in the Chancery Court Action. *Id.* at 12. However, the alleged "evidence" in the footnote is merely a recitation of the contract's closing date of January 17, 2024. Simply because the contract was executed prior to the bankruptcy filing

does not support the notion that potential additional consideration – dependent upon actions to be taken under the contract post-petition – on top of millions of dollars Natera paid at closing – became vested on the closing date notwithstanding an intervening breach of the contract by the Debtors. In addition, Invitae relies on inapposite case law that will be discussed herein, but which does not support its argument that the Milestone Payment was a vested right to payment upon executing the APA. There is no evidence or legal support for Invitae's assertion, not to mention that there is nothing to suggest Invitae's breach would not terminate Natera's continuing obligations under the APA, including the steps needed to qualify for a Milestone Payment. In support of Invitae's claims, Natera, a non-breaching party, would be forced to perform under a contract long after Invitae breached. This is not supported by law.

8. ***Fourth*****,** citing no legal support, Invitae argues that it had no choice but to reject the contract because all liquidating debtors must reject executory contracts, and that somehow a plan administrator may pursue all causes of action (past, present, and future) on a rejected contract, rather than an assumed contract. Motion to Dismiss, at 10. The fact that liquidating debtors assume and assign executory contracts regularly to plan administrators belies this assertion. Indeed, Invitae's own plan documents contemplated that contracts could be assumed and assigned to Mr. Spirito, the Plan Administrator in the Debtors' Chapter 11 Cases. Invitae merely chose to instead try for the best of both worlds – have the benefits of Natera continuing its performance under a contract as if it were assumed without the burdens to itself of actually assuming it and curing any defaults. Bankruptcy Code section 365 and state contract law do not permit this result.

9. Finally, while Invitae has not directly addressed its standing to pursue actions related to Natera's continuing performance obligations under a rejected contract and the Plan Administrator's standing to pursue such actions on the Debtors' behalf, as discussed more fully

herein, Mr. Spirito does not have standing to pursue causes of action involving Natera's performance obligations post-petition. The rejection of the contract removes those claims and causes of action from the estate. Only estate assets can be transferred to Mr. Spirito.

10. For these reasons, and the reasons set forth below, the Motion to Dismiss must be denied.

**LEGAL STANDARD**

11. In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406 (2002); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n. 1 (3d Cir. 2014) (same). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.*

12. The Supreme Court in *Ashcroft v. Iqbal,* made clear that a plaintiff need only include sufficient factual allegations in his complaint to "nudge[] [his] claims" . . . "across the line from conceivable to plausible." 556 U.S. 662, 680 (2009) (quoting *Twombly*, 550 U.S. at 570). The *Ashcroft* Court held:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ***The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.*** Where a complaint pleads facts that are merely consistent with a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

556 U.S. at 678 (internal citations omitted) (emphasis added).

## ARGUMENT

### I. The Complaint Provides More Than Sufficient Factual Allegations to Survive a Motion to Dismiss.

13. Natera has provided more than sufficient factual allegations in its Complaint to meet the legal standard set forth by the Supreme Court such that the Motion to Dismiss should be denied.

14. Natera described the contract with Invitae – the confidential Asset Purchase Agreement, dated January 17, 2024 (the "APA") and the breach by Invitae – in enough detail to support the need for declaratory judgment and injunctive relief.

15. Natera explained that it executed the APA prior to the bankruptcy filing to purchase certain assets from Invitae. Complaint, at ¶ 23. It explained that both parties had certain contingent future obligations under the APA, and that Natera continued to perform under the APA during the Chapter 11 Cases.[6] *Id.* at ¶¶ 2, 4. Natera explained some of the future obligations (*e.g.*, the Volume Retention Percentage and a potential Milestone Payment).[7] *Id.* at ¶ 3.

---

[6] As discussed above, the parties do not dispute the executory nature of the APA and that Natera continued to perform under the APA during the Chapter 11 Cases. *See supra*, n. 4.

[7] As discussed in the Complaint, the APA contained information that was designated by Invitae and Natera as confidential pursuant to a certain Confidentiality and Rule 408-Plus Agreement, dated as of September 1, 2022. Natera noted that it would provide more details regarding the terms of the APA in a submission filed pursuant to a Motion Under Seal should the Court enter a scheduling or briefing order in this case. Natera believes that the

16. Natera also explained that while it was waiting for Invitae to decide whether it would assume or reject the APA, it took actions in the Chapter 11 Cases such as filing motions and negotiating language to preserve its future rights under the APA in the Debtors' Confirmation Order. *Id.* at ¶ 4. Natera's Complaint illustrates the specific language in the Confirmation Order that was negotiated prior to Invitae's rejection of the APA, which was intended to preserve the parties' rights with respect to the APA while allowing the Debtors to confirm their Plan. *Id.* at ¶¶ 30-31.

17. Natera's Complaint also provides details of the dates on which the Debtors filed their various plan documents, the date on which the Court entered the Confirmation Order, and the date on which the APA first showed up on a Contract Rejection Schedule (*i.e.,* the Effective Date of the Plan, which was long after the negotiated language discussed above was provided in the Confirmation Order). *Id.* at ¶¶ 25-36.

18. Natera's Complaint makes clear that, following the Effective Date, the APA remained on the Schedule C – the Rejection Schedule, and was not removed from the that schedule during the time prescribed for doing so under the Debtors' Plan. *Id.* at ¶¶ 37-38.

19. Natera's Complaint provides details about the Chancery Court Action and how the Debtors seek to proceed under the APA as if it were not rejected. *Id.* at ¶¶ 39-41.

20. Natera's Complaint further explains that this controversy regarding proceeding in the Chancery Court Action without giving any effect to the rejection of the APA and the breach of APA as of the Rejection Date (*i.e.*, the day before the Petition Date), is a controversy that is of sufficient immediacy to warrant relief under the Declaratory Judgment Act, 28 U.S.C.§§ 2201-02.

---

details provided in the Complaint are sufficient to withstand a Motion to Dismiss. Should the Court want more factual details prior to a scheduling or briefing order, Natera asks that it be afforded an opportunity to amend its Complaint to provide the confidential facts, along with a Motion to Seal.

*Id.* at ¶¶ 42-46.[8] Natera's Complaint provides evidence that this Court is the proper forum in which Natera was to bring its suit because this Court retained exclusive jurisdiction to determine issues involving contract rejection and assumption. *Id.* at ¶¶ 12-17, 44.[9]

21. Finally, Natera's Complaint provides the bases for seeking injunctive relief under Bankruptcy Code section 105 and/or Federal Rule of Bankruptcy Procedure 7065 to avoid irreparable injury to Natera that would occur if actions were continuing in other courts before this Court resolves the gating issue regarding the practical and legal effects of the Debtors' rejection of the APA and whether the Debtors' breach, as of the Rejection Date pursuant to Section 365(g), has an effect on a non-breaching party's performance obligations under a rejected contract. *Id.* at ¶¶ 47-53.[10]

22. Accordingly, Natera's Complaint contains sufficient factual matter that, accepted as true, states a claim for relief that is plausible on its face, such that the Motion to Dismiss must be denied.

## II. Invitae's Arguments Do Not Support Dismissal of Natera's Complaint for Declaratory Judgment and Injunctive Relief

### A. Arguments Regarding Notice and Surprise Having Nothing to Do With Rejection of the APA

23. Invitae dedicates much of its Motion to Dismiss to this idea of notice and lack of surprise, which, while generally relevant in some aspects of a bankruptcy proceeding, have nothing to do with the issue raised by Natera in its Complaint regarding the effects of the rejection of the

---

[8] Invitae did not challenge declaratory judgment as a proper procedure. *See supra* ¶ 1. In addition, federal courts, including bankruptcy courts, may grant declaratory relief pursuant to the Declaratory Judgment Act. *See, e.g., In re 400 Walnut Associates, L.P.*, 454 B.R. 60, 74 (Bankr. E.D. Pa. 2011) ("When there is actual controversy between the parties, the [Declaratory Judgment] Act allows a court to settle the parties' respective rights, even before there is a violation of law, exercise of right, or breach of duty.").

[9] Invitae has not contested this Court's exclusive jurisdiction. *See supra* n. 3.

[10] Invitae did not challenge injunctive relief as a proper procedure. *See supra* ¶ 1.

APA and a declaratory judgment that Natera has no continuing obligations under the rejected APA going forward.

24. Specifically, Invitae argues that (1) its Disclosure Statement revealed that the Debtors had the "potential [to receive] cash milestone payments" pursuant to the APA and Mr. Spirito even mentioned this on cross examination at the Confirmation Hearing (Motion to Dismiss, at 3, 9-10); (2) Natera was active in the bankruptcy cases (*Id.* at 4); (3) the parties negotiated Natera's preservation of rights language in the Confirmation Order that was approved by the Court (*Id.* at 8); and (4) "The Delaware Action should be a surprise to no one." *Id.*

25. Natera never disputed what was contained in the Disclosure Statement or Confirmation Order, or what was described by Mr. Spirito on cross-examination. But notice of these events is a red herring because it has nothing to do with rejection of the APA.[11] For purposes of the Section 365(g) inquiry at the forefront of Natera's Complaint, the focus must remain on rejection and what the rejection means in terms of Natera's continuing obligation to perform under the APA after the Debtors' breach.

26. The Debtors determined in their business judgment[12] to reject the APA the Effective Date of the Plan, which (a) constituted a material breach by the Debtors effective immediately prior to the Petition Date, (b) relieved both parties of their respective ongoing obligations under the APA, and (c) relieved both parties of the right to future benefits from the APA. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 40 (3d Cir. 1989)

---

[11] While surprise is not the relevant inquiry, it should be noted that the rejection of the APA was a surprise to Natera. The decision to reject the APA was not disclosed in the Disclosure Statement or conveyed to Natera as part of the negotiations to preserve Natera's rights in the Confirmation Order. The first notice of the rejection was set forth in the rejection schedule filed on the Effective Date of the Plan, or August 7, 2024. *See* Complaint at ¶ 34.

[12] A debtor's rejection decision is evaluated using the business judgment rule. *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 373-74 (2019).

("we acknowledge the general principle that a debtor may not reject a contract but maintain its benefits"); *see also In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("If [the debtor] accepts the contract he accepts it *cum onere*. If he receives the benefits, he must adopt the burdens. He cannot accept one and reject the other."); *In re Healfitz*, 85 B.R. 274, 283 (Bankr. S.D.N.Y. 1988) (trustee may not "blow 'hot or cold'"; he must either reject the contract in full or assume the contract in full, which includes both the benefits under the contract and its burdens) (quoting *Italian Cook*,190 F.2d at 997). Accordingly, the effect of the Debtors' rejection of the APA is that performance obligations on Natera's part as the non-breaching party are extinguished.

**B. Natera's Requested Relief is Not Inconsistent With the Plan and Plan Supplement.**

27. Invitae's argument that the Plan documents foreclose Natera's request for declaratory and injunctive relief from this Court leaves an impression that what Natera is asking for conflicts with and/or tries to unravel the Plan and other Plan documents. This argument is without merit.

28. Natera's performance obligations under the APA (if any) can be determined by this Court *without* altering the Plan documents. These are not mutually exclusive concepts. As discussed above, to the extent a cause of action existed based on Natera's performance before the Debtors' breach, rejection has no effect on such claims. *See Mission Product,* 587 U.S. at 372 ("A rejection breaches a contract but does not rescind it. And that means all the rights that would ordinarily survive a contract breach . . . remain in place"). Thus, the Debtors could retain causes of action related thereto and transfer such actions to the Plan Administrator. This is consistent with Schedule A of the Plan Supplement and language in the Debtors' Plan regarding retaining causes of action, notwithstanding rejection or repudiation. Motion to Dismiss at 11 ("notwithstanding the rejection or repudiation of the APA . . . the Plan Administrator reserves the

right and ability to pursue the *causes of action that the Debtors retain against Natera*.") (emphasis added). But that is not the claim Invitae is attempting to preserve.

29. The inclusion of a contract on Schedule C in the Plan Supplement – the Rejection Schedule – carries legal effects besides merely cutting off administrative claims of creditors.[13] The Schedule also defines the scope of what causes of action the Debtors *actually retained* against Natera because the rejection (*i.e.*, breach) acts to cut off subsequent claims. Indeed, the Supreme Court also observed that "breach" is "neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside of bankruptcy." *Id.* at 379. "Congress generally meant for the Bankruptcy Code to 'incorporate the established meaning' of 'terms that have accumulated settled meaning'"). *Id.* (citing *Field v. Mans*, 516 U.S. 59, 69 (1995)). ***Accordingly, the "first place to go in divining the effects of rejection is to non-bankruptcy contract law, which can tell us the effects of breach."*** *Id.* (emphasis added).[14]

30. In any event, there is nothing inconsistent or at odds with the Plan and the Plan Supplement remaining in full force and effect while at the same time determining the effect of the

---

[13] Invitae relies elsewhere in its Motion to Dismiss on *In re Shar*, 253 B.R. 621, 634 (Bankr. D.N.J. 1999) (citing *In re Walnut Associates*, 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992)), for the proposition that the "only effect of rejection" is that the non-debtor party cannot claim an administrative claim for damages. However, even the *Walnut* Court observed that ***"[t]his is not to say that rejection has no effect."*** 145 B.R. at 494 (emphasis added). Here, Natera is seeking to determine the effect of the rejection on its own continuing performance obligations under the APA.

[14] The APA is governed by Delaware law. Under Delaware law, "a party [to a contract] is excused from performance . . . .if the other party is in ***material breach"*** of its contractual obligations. *BioLife Solutions, Inc. v. Endocare, Inc.,* 838 A.2d 268, 278 (Del. Ch. 2003) (emphasis added). Specific facts under the APA that would illustrate Invitae's material breach are not discussed here, but the contract is an undisputed executory contract, under which the failure of either party to complete performance constitutes a "material breach." *See In re Exide Technologies*, 607 F.3d 957, 962 (3d Cir. 2010) (An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far [unperformed] that the failure of either to complete performance would constitute a ***material breach*** excusing the performance of the other) (quoting Vern Countryman, *Executory Contracts in Bankruptcy: Part 1,* 57 MINN. L. REV. 439, 460 (1973) (emphasis added)).

Debtors' rejection is on Natera's post-breach obligations. To the contrary, this exercise is consistent with the Plan and is required by both bankruptcy and state law.[15]

**C. The Milestone Payment Did Not Become Due Prior to the Debtors' Breach, And Invitae's Legal Support for A Vested Rights to Payment Under the APA Does Not Apply**

31. Knowing that it has a problem due to its own breach, Invitae asserts, without any support, that the Milestone Payment "matured" when the parties closed on the APA and that Natera's "*duty to remit* the Milestone Payment (and Invitae's *earned* right to receive it) was triggered – all that remained was deferred calculation." Motion to Dismiss at 12 (emphasis added).

32. This is false, and Invitae's own statements demonstrate that fallacy. For example, the First Disclosure Statement indicated that the Debtors had the "*potential* [to receive] cash milestone payments" *Id.* at 3 (emphasis added); the Second Disclosure Statement included the Milestone Payment as a "*potential* asset[]" (*Id.* at 9) (emphasis added); and it also noted the payment was "*subject to dispute* and reconciliation and not likely available for immediate distribution as of the Effective Date." (*Id.*) (emphasis added). Thus, even before the APA was rejected, Invitae did not describe the Milestone Payment as "vested," "earned," or subject to Natera's purported "duty to remit." To the contrary, the Debtors' language described contingent receivables that may or may not result in additional payments.

33. Invitae's attempt to find legal support for its argument that the Milestone Payment was a vested right to payment at the time of the APA closing is equally unavailing. For instance,

---

15 The cases cited by Invitae that a Plan acts like a contract do not change this result and involve challenges to the to a plan involving plan modifications or other facts that are not at issue here. *See, e.g., Karathansis v. THCR/LP Corp.*, No. 06-1591 (RMB), 2007 WL 1234975 (D.N.J. Apr. 25, 2007) (involving an issue whether distributions under a plan were only to be made to record holders or actual beneficial holders notwithstanding that the Court denied the debtor's earlier request to modify the plan to change the record date); *see also G-I Holdings, Inc. v. Ashland, Inc. (In re G-I Holdings Inc.)*, No. 17-0077, 2017 WL 1788656 (D.N.J. May 5, 2017) (involving a jurisdictional issue related to dischargeability of a debt that was not within the exclusive jurisdiction of the bankruptcy court).

Invitae relies on *Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 336 (3d Cir. 1984*), overruled in part by In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010), for the proposition that where a party contracts with another party that depends upon the occurrence of a certain event, there exists a contingent right to payment upon execution of the agreement. However, what Invitae fails to mention is that, among other things, the *Frenville* Court makes clear that the "right to payment, albeit contingent, upon signing an agreement" only automatically occurs in special circumstances such as ***indemnity and surety agreements,*** not all contracts, and, perhaps more importantly, this does not involve a case with an executory contract under which a non-breaching party is being forced to perform post-rejection. *Id.* at 336-37. Likewise, *In re G-I Holdings, Inc.,* is no better for Invitae because it involved that very type of agreement – an indemnity agreement. The APA is not a surety or indemnity agreement.

34. Invitae's vesting argument is also not supported by *Kavod Pharms. LLC v. Sigmapharm Labs, LLC (In re Tri Harbor Holdings Corp.),* No. 19-2053 (VFP), 2022 WL 17184547 at *5, 12-13 (Bankr. D.N.J. Nov. 22, 2022). In *Kavod*, there was no vested right to payment upon executing a contract, but rather, the Court found that the non-debtor party breached its contract with the debtor prior to the rejection date by improperly sending a notice to terminate the contract long before the bankruptcy filing. The Court rightly determined those claims survived the rejection because they preceded the rejection. The decision has nothing to do with vested rights to payment at the time of executing a contract. It has to do with who breached first – the debtor or the non-debtor. Here, there are no allegations that Natera breached at any time, let alone prior to the Debtors' breach.

35. *First Ave. W. Building, LLC v James (In re Onecast Media, Inc.)*, 439 F.3d 558, 563 (9th Cir. 2006), also does not support the "vested right to payment at signing of a contract"

argument. In *Onecast*, the dispute involved an appeal related to whether the trustee in a chapter 7 case could recover damages related to a remaining piece of a security deposit. *Id.* at 560-61. The Court noted that "[w]hile rejection of a lease prevents the debtor from obtaining future benefits of the lease (such as ongoing possession of the premises), it does not rescind the lease. . ." such that the rejection did not bar the trustee's breach of contract action to recover the balance of a prepetition security deposit. *Id.* at 563. Again, there is no allegation that Natera committed any breaches, pre- or post-petition and any cause of action now depends upon Natera's continued performance on a rejected contract, not actions taken or failed to be taken by Natera prior to the Debtors' breach. In sum, none of the cases stand for the proposition that the Milestone Payment vested Invitae with a right to payment the minute the Debtors executed the APA and notwithstanding any potential breach on their part.

36. Finally, in addition to the case law providing no support for vested rights to payment in this context, Invitae's attempt to rely on the Bankruptcy Code's definition of a "claim" to support Invitae's assertion that somehow it has a vested right to payment also fails. Motion to Dismiss at 13-14 (citing 11 U.S.C. § 101(5)(A)). Here, two things are relevant: (1) Invitae's alleged claim is not a claim *against the estate* subject to discharge and governed by the Bankruptcy Code; and (2) whatever claim Invitae has depends upon the rights of the parties after the Debtors breached the APA pursuant to Section 365(g) and applicable breach of contract law.

37. Simply put, Invitae has provided no factual or legal support that it had a vested right to payment upon signing the APA.

**D. Liquidating Debtors Assume & Assign Contracts Regularly**

38. Invitae also argues that it was compelled to reject the APA because there is some unique rule requiring non-operational liquidating debtors to reject all executory contracts with third parties. Motion to Dismiss, at 10. Invitae goes so far as to say that assuming such contracts

would not be consistent with Invitae's fiduciary obligations. *Id.* Invitae cites no support for this argument, nor could it, as no such rule exist.

39. Liquidating debtors regularly assume and assign third-party executory contracts to plan administrators or trustees of liquidating trusts. *See, e.g.,* Examples of Recent Liquidating Chapter 11 Cases in which executory contracts were assumed and assigned to a plan administrator or liquidating trustee:

| Case | Jurisdiction | Liquidating Debtors | Plan Supplement with Assumption of Third-Party Executory Contracts | Counsel for the Debtors |
|---|---|---|---|---|
| *In re First Mode Holdings, Inc.*, Case No. 24-12794 (KBO) | Delaware | Yes | Dkt. No. 388 | Latham & Watkins<br><br>Young Conaway Stargatt & Taylor LLP |
| *In re Casa Systems, Inc.*, Case No. 24-10695 (KBO) | Delaware | Yes | Dkt. No. 394 | Sidley Austin LLP<br><br>Young Conaway Stargatt & Taylor LLP |
| *In re Sequential Brands Group, Inc.*, Case No. 21-11194 (JTD) | Delaware | Yes | Dkt. No. 402 | Gibson Dunn & Crutcher LLP<br><br>Pachulski Stang Ziehl & Jones LLP |
| *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) | SDNY | Yes | Dkt. No. 1035 | Kirkland & Ellis LLP |

40. In addition, Invitae's bankruptcy case itself contemplates that Mr. Spirito would have authority to "enforce Executory Contracts and Unexpired Leases that are assumed pursuant

to the Plan or by any order the Bankruptcy Court and have not been assigned to a third party on or prior to the Effective Date."[16] Plan Administrator Agreement, Exhibit D, ¶ 2(xviii) [Dkt. No. 857]. In sum, there was no prohibition on assuming and assigning a third-party executory contract to Mr. Spirito. Indeed, Invitae's own counsel, as illustrated in the chart above, as well as other competent bankruptcy counsel, have been involved in the drafting of liquidating plans where this customarily occurs, and it was at least contemplated to occur here based on the language in the Plan Administrator Agreement, which was included in the Plan Supplement.

41. Moreover, it is the very essence of bankruptcy law that requires a debtor to assume executory contracts if the estate is to benefit from them. *See In re Fleming Cos.*, 499 F.3d 300, 304 (3d Cir. 2007) ("the trustee [can] maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not." ) (citing *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (internal quotation omitted). If Invitae truly believed that the contract would add value to the estate, it had every opportunity to assume the contract. It chose instead, in its sole business judgment, not to do so, but there was no prohibition on doing so.

## III. The Plan Administrator, Acting for Invitae, Lacks Standing to Bring the Chancery Court Action

42. Invitae argues that the Plan reserved the Plan Administrator's "right and ability to pursue the causes of action that the Debtors retain against Natera." Motion to Dismiss, at 11. However, the Plan Administrator's rights and abilities to pursue causes of action changed after the

[16] Presumably, the assignment to third parties involves, at a minimum, Labcorp, which purchased substantially all of the Debtors' assets in the Chapter 11 Cases.

Debtors decided to reject the APA. Under these circumstances, the Plan Administrator does not have standing to bring the Chancery Court Action.[17]

43. Even where a cause of action is preserved according to the terms of a plan, a debtor's subsequent rejection of an executory contract forecloses the right of such debtor (or other estate representative) to bring actions for alleged *post-petition* breaches of the rejected contract. This foreclosure occurs because the continuation of benefits of an executory contract after a debtor's own breach (*i.e.,* rejection) are not property of the debtor's estate. *Matter of Taylor*, 913 F.2d 102, 107 (3d Cir. 1990) ("It is the trustee's decision (whether to assume or reject) that determines whether the benefits of an executory contract will or will not become property of the estate.").

44. The effect of a debtor's rejection is well settled law:

> Most debtors enter bankruptcy with some contracts that are still "executory." Depending on its terms, an executory contract can be an asset or liability to the debtor's estate. Unlike ordinary assets, executory contracts do not automatically enter the estate. Instead, Section 365 of the Bankruptcy Code provides the trustee with a choice: she can either "assume" or "reject" the executory contract. If the executory contract is assumed, the debtor's estate becomes bound to it. If the executory contract is rejected, the rejection is treated as a prebankruptcy breach by the *debtor* (not the bankruptcy estate).

Jesse M. Fried, *Executory Contracts and Performance Decisions in Bankruptcy*, 46 DUKE L. REV. 517, 518–19 (1996) (internal notes omitted) (emphasis in original). In addition, pursuant to Bankruptcy Code section 365(f), once a debtor assumes a contract, the debtor can assign the contract. *See* 11 U.S.C. § 365(f)(2)(A) ("The trustee may assign an executory contract . . . of the

[17] The Plan cannot foreclose Natera's right to challenge standing, a jurisdictional requirement. Such a challenge is never waived and therefore can be asserted at any stage in the litigation. *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The question of standing is not subject to waiver."); *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.").

debtor only if the trustee assumes such contract . . . in accordance with the provisions of this section."); *see also In re Access Beyond Technologies, Inc.,* 237 B.R. 32, 47 (D. Del. 1999) ("[a]n executory contract does not become an asset of the estate until it is assumed pursuant to § 365(a) of the Code.") (citation omitted)*; In re Fleming*, 499 F.3d at 304-305 ("Upon assuming an executory contract, the trustee is likewise authorized to assign the executory contract.").

45. Though infrequently at issue, the decision not to assume and assign an executory contract to a plan administrator calls into question a plan administrator's standing to bring causes of action based on that contract. The Southern District of Texas has considered such a case in *Lauter v. Citgo Petroleum Corp.*, Case No. CV H-17-2028, 2018 WL 801601 (S.D. Tex. Feb. 8, 2018) (emphasis in original).

46. In *Citgo Petroleum*, the debtor, Gas-Mart USA, and Citgo Petroleum Corporation had entered into a franchise agreement in 2013, and a related vendor agreement in 2015 (the "Agreements"). *Id.* at *1. In 2015, Gas-Mart filed chapter 11. *Id.* By February 2016, Gas-Mart sold substantially all of its assets through its bankruptcy, which did not include the Agreements. *Id.* at *2. Instead, in March 2016, Gas-Mart moved to reject certain executory contracts, including the Agreements with Citgo. *Id.* In September 2016, the Bankruptcy Court confirmed a liquidating plan that called for the creation of a creditor trust. *Id.* Richard Lauter was thereafter appointed as the trustee of the creditor trust. *Id.* Among other things, the trustee filed suit against Citgo for certain alleged post-petition breaches of the Agreements. *Id.* at *3.

47. Citgo argued that the trustee lacked standing to pursue post-petition breach of contract claims against it due to Gas-Mart's rejection of the Agreements. *Id.* at *4. The Court agreed and concluded the following:

> ***Plaintiff has not cited and the court has not found any authority allowing a debtor's estate or a successor-in-interest such as the***

> ***creditor trustee plaintiff in this action to pursue claims for post-petition breaches of a rejected contract***. Because rejection is an affirmative declaration by the debtor that the estate will not take on the obligations of a pre-petition contract made by the debtor, Gas-Mart's ***rejection of the [contract with a non-debtor] not only relieved the estate of its post-petition performance obligations, but also relieved the estate of its ability to assert claims for post-petition breaches thereof***.

*Id.* at *15 (emphasis added). The Court reached this conclusion ***notwithstanding also reaching the conclusion that the plan documents were "specific and unequivocal"*** to preserve the trustee's right to pursue breach of contract claims against Citgo because it identified the basis of recovery (breach of contract), and the identity of the defendant (Citgo) by name. *Id.* at *10. It was the act of ***rejection of the contracts that changed the course*** because the breach claims alleged post-petition breaches of an agreement that Gas-Mart rejected pursuant to Section 365, which left the trustee with lack of standing to pursue the contract claims and left the court to dismiss the action for lack of subject matter jurisdiction. *Id.* at *16.

48. The *Citgo Petroleum* Court also observed the following:

> ***Moreover, pursuant to § 365(f) executory contracts must be assumed by the debtor <u>before</u> they can be assigned. Gas-Mart's rejection of the Citgo Agreement therefore precluded the post-petition breaches from becoming assets of Gas Mart's estate that could be assigned and transferred to the creditor trust.***

*Id.* (emphasis in the original and certain emphasis added).

49. Here, we face the same situation. Invitae does not have any claims against Natera for any alleged *pre-petition* breaches, which potentially would be assets of the estate notwithstanding assumption or rejection. Instead, Invitae has brought the Chancery Court Action seeking to have the Delaware state court determine contract provisions that dictate Natera's *post-petition* performance obligations. Accordingly, for the reasons set forth in *Citgo Petroleum*, Invitae needed to assume the contract and assign it to the Plan Administrator in order to make the

APA an asset of the estate. Only then could Mr. Spirito litigate post-petition performance terms and/or post-petition breach allegations.[18] Because the Debtors did not assume the APA, the APA is not property of the estate, and Mr. Spirito does not have standing to pursue the matters he has outlined in the Chancery Court Action.

---

[18] As noted above, Natera performed under the APA while it awaited Invitae's decision to assume or reject the contract. *See supra* at ¶ 15. Invitae did not like the results it received and wants the state court to declare a different result based on the methodology used to calculate certain contingent payments, but as discussed herein and in the Complaint, the Debtors' breach would cut off Natera's post-petition performance obligations such that the calculation methodology for these performance obligations is moot.

## CONCLUSION

**WHEREFORE**, by reason of the foregoing, Plaintiff Natera Inc. respectfully requests that Defendant's Motion to Dismiss be denied.

Dated: May 20, 2025

Respectfully submitted,

By: */s/ Robert K. Malone*

**GIBBONS P.C.**
Robert K. Malone
Kyle P. McEvilly
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
kmcevilly@gibbonslaw.com

-and-

**MCDERMOTT WILL & EMERY LLP**
Darren Azman (admitted *pro hac vice*)
Lisa A. Gerson (admitted *pro hac vice*)
Deanna D. Boll
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Email: dazman@mwe.com
lgerson@mwe.com
dboll@mwe.com

*Co-Counsel to Natera Inc.*